**FILED**

FEB 1 2 2014

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

Grant H. Goodman, Teri Goodman
3104 E. Camelback Road, Suite 563
Phoenix AZ 85016
Phone: (602) 840-2393 (602) 999-9789
granthgoodman@msn.com

*Pro per*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

)  Case No.

**GRANT GOODMAN** and **TERI**
**GOODMAN**
(Husband-wife/individually/
guarantors/sureties)
3104 E. Camelback Road, Suite 563
Phoenix AZ 85016
Phone: (602) 840-2393 (602) 999-9789
granthgoodman@msn.com

Plaintiffs,

v.

**WILLIAMS & CONNOLLY, LLP,**
(Washington D.C.); *and*, **ELLEN**
**OBERWETTER** (Washington, D.C.)
**Williams & Connolly LLP**
725 Twelfth Street, N.W.
Washington, D.C. 20005
**Phone:** 202-434-5000

**GREENBERG TRAURIG, LLP**
(Washington, D.C.)
2101 L Street, N.W.
Suite 1000
Washington, DC 20037
T 202.331.3100  (continued)

COMPLAINT

18 U.S.C. §§1961-1968, *et seq.*

Case: 1:14-cv-00202
Assigned To : Lamberth, Royce C.
Assign. Date : 2/12/2014
Description: Pro Se General Civil

JURY TRIAL DEMANDED



- 1 -

1 | **OSBORN MALEDON, P.A.;** )
2 | **WILLIAM MALEDON/GEOFF** )
   | **M.T. STURR** *and* **COLIN F.** )
3 | **CAMPBELL** )
   | The Phoenix Plaza )
4 | 2929 North Central Avenue, #2100 )
   | Phoenix, AZ 85012-2793 )
5 | Phone: 602-640-9000 )
6 | )
   | **DICKINSON RIGHT/MARISCAL** )
7 | **WEEKS** *and* **MICHAEL S. RUBIN;** )
8 | 2901 N. Central Avenue, Suite 200 )
   | Phoenix, AZ  85012 )
9 | Phone: 602-285-5000 )
10 | )
   | **UNION ANDINA** *de* **CEMENTOS** )
11 | **S.A.A./Ricardo Cesar Rizo Patron** )
12 | **de la Piedra** )
   | Av. Atocongo 2440 )
13 | Villa Maria del Triunfo )
14 | LIMA,  Peru )
   | Phone: +51 12170200 )
15 | )
   | Defendants. )
16 | )
17 | )

- 2 -

## OPERATIVE FACTS—I

(1)     Williams & Connolly initially brought its brand to Phoenix, Arizona, in the summer of 2010 centered on defense of the largest Ponzi scheme in Arizona history—Mortgages Limited. Defendant Williams & Connolly represented Defendant Greenberg Traurig, LLP. Williams & Connolly, LLP with Greenberg Traurig, LLP, entered into a series of agreements with Defendants Osborn Maledon, Dickinson Wright/Mariscal Weeks, and later, through its agents, UNION ANDINA *de* CEMENTOS SAA S.A. The general scope of the agreements came to fruition through oral argument on August 30, 2010. Plaintiff's statements in the Official Reporter's Transcript and Plaintiff's official record filings were, in association with then Arizona District Court Judge Mary H. Murguia, materially altered, intentionally misquoted, and effectively rewritten in total—to obstruct official federal proceedings and to repudiate and impede investigation into the associated-in-fact enterprise RICO conduct.

(2)     On or about September 14, 2010, Judge Murguia, Williams & Connolly, as well as all Defendants, had electronic and mailed copies of the August 30, 2010, Official Transcript. Williams & Connolly along with Greenberg Traurig received all interstate wires in their Washington, D.C. offices. All mailings were set to Williams & Connolly and Greenberg Traurig in their Washington, D.C offices. Defendants

Williams & Connolly, with Greenberg Traurig and Osborn Maledon sent one another email subject to the crime-fraud exception, to and from, Washington, D.C., from August 2010 through January 2014. Electronic correspondence, telephone records, billing statements, and money transfers to and from Washington, D.C., show drafting and consultation between Williams & Connolly, Greenberg Traurig, Osborn Maledon, and, Dickinson Wright/Mariscal Weeks in altering and fabricating an 'inherent authority' disbarment Order to Show Cause filed on or about September 14, 2010. Billing statements from Williams & Connolly with Greenberg Traurig, Dickinson Wright/Mariscal Weeks, and Osborn Maledon were filed in the official record, from Washington, D.C., from March 21, 2011 through September 2011.

(3)     The Defendants sent, transferred, and received approximately $170,000.00, to and through Washington, D.C., awarded by Judge Murguia, sent by wire interstate and by mail inter-and intrastate. Williams & Connolly (Oberwetter) testified interstate by wire into Phoenix, Arizona, in official proceedings on March 2, 2012. Williams & Connolly testified as to their Washington, D.C. conduct, from Washington, D.C., utilizing the protections of Washington, D.C., to avoid Plaintiffs' in person cross-examination. Williams & Connolly entered into 'joint defense' agreements in Washington, D.C., with Defendants Dickinson Wright/Mariscal Weeks, and Osborn Maledon. Williams & Connolly Fee Agreements with Greenberg Traurig, LLP, were originated, drafted, and finalized for electronic and

hard-copy storage in Washington, D.C. Billing statements, on a monthly basis, from Williams & Connolly related to Defendant Greenberg Traurig and their conduct at issue here, were sent from Williams & Connolly, Washington, D.C., to Greenberg Traurig, Washington, D.C., throughout 2010-2011-2012-2013.

## JURISDICTION and VENUE—II

(4)     Plaintiff may properly lay venue in Washington, D.C., in accordance with either **18 U.S.C. § 1965(a)(b)(d)** *or* **28 U.S.C. § 1391(b)** ("transacts his affairs" to mean the same thing as the phrase "transacts business"). There is diversity of citizenship between plaintiff and defendants and a sufficient amount in controversy to support subject-matter jurisdiction under **28 U.S.C. § 1332(a)(1)**. Section **1391(b)(2)** allows plaintiff a choice among multiple districts where a substantial portion of the underlying events occurred. Section 1391(b)(2) is intended to place venue within the District of Columbia, even where the case also might be brought in another forum; **D.C. Code § 13-334(a)** permits courts to exercise 'general jurisdiction' over a foreign corporation as to claims not arising from the corporation's conduct in the District if the corporation is 'doing business' in the District. **D.C. Code § 13-423(a)**, in relevant part, authorizes the court to: exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's: (1) transacting any business in the District of Columbia; (2) contracting to supply services in the District of Columbia; (3) causing tortious injury in the

District of Columbia by an act or omission in the District of Columbia; (4) causing

tortious injury in the District of Columbia by an act or omission outside the District

of Columbia if he regularly does or solicits business, engages in any other persistent

course of conduct, or derives substantial revenue from goods used or consumed, or

services rendered, in the District of Columbia. **D.C. Code § 13-423(a)** authorizes

the court to exercise personal jurisdiction over a defendant who, whether "directly

or by an agent" (also co-conspirators), "transact[s] any business in the District of

Columbia." **D.C. Code § 13-423(a)(1)**; For "conspiracy" jurisdiction under

subsection (a)(3), the plaintiff must allege "(1) the existence of a civil conspiracy . .

., (2) the defendant's participation in the conspiracy, and (3) an overt act by a co-

conspirator within the forum, subject to the long-arm statute, and in furtherance of

the conspiracy.[1] **Section 13-423(a)(1)** of the District of Columbia Code provides that

"[a] District of Columbia court may exercise personal jurisdiction over a person,

---

[1] **18 U.S.C. § 1512(b)** states:  Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to - (1) influence, delay, or prevent the testimony of any person in an official proceeding; (2) cause or induce any person to - (A) withhold testimony, or withhold a record, document, or other object, from an official proceeding; (B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding; (C) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or **(3)** hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense ... shall be fined under this title or imprisoned not more than ten years, or both.

who acts directly or by an agent, as to a claim for relief arising from the person's transacting any business in the District of Columbia." **D.C. CODE § 13-423(a)(1).**

## PARTIES—III

(5)   **Grant Goodman** and **Teri Goodman** are self-represented plaintiffs. Suit is brought in their individual, community, and guarantor/surety capacities. Plaintiffs are residents of Maricopa County, Phoenix, Arizona. Plaintiffs have sustained, and continue to sustain, direct damage to their business and property interests, by the direct and proximate cause of Defendants unlawful conduct independently, and/or in conspiracy with the associated-in-fact enterprise named Defendants. Those not captioned defendants, discussed throughout, act, and have acted, by agreement, to carry out the unlawful activities of the enterprise and are associated-in-fact with Defendants.

(6)   **WILLIAMS & CONNOLLY, LLP** (Washington, D.C.) and **ELLEN OBERWETTER** (Washington, D.C.) are residents of Washington, D.C., and have caused and directed their unlawful activities against Plaintiffs business and property interests from, and through, Washington, D.C. These Defendants have directly and proximately caused damage to Plaintiffs business and property interests through unlawful activities.

(7)  **DICKINSON WRIGHT/MARISCAL WEEKS**, and its Partner, **Michael S. Rubin**, are liable, jointly, independently, and individually for direct participation in schemes and unlawful activity proximately and directly causing damage to Plaintiffs' business and property interests. These defendants are residents of Maricopa County, Phoenix, Arizona, and act, and have acted in concert with, for, and in agreement with associated-in-fact enterprise co-defendants, directing their unlawful activities through, to, and from, Washington, D.C.—utilizing the laws and protections afforded those conducting business in Washington, D.C., through Williams & Connolly, LLP, Ellen Oberwetter, and Greenberg Traurig, LLP, of Washington, D.C.

(8)  **Osborn Maledon, P.A.** and its Partners, William Maledon, Geoff Sturr, and, Colin F. Campbell, are liable, jointly, independently, and individually for direct participation in schemes and unlawful activity proximately and directly causing damage to Plaintiffs' business and property interests along with their non-defendant enterprise associates. These defendants are residents of Maricopa County, Phoenix, Arizona, and act, and have acted in concert with, for, and in agreement with associated-in-fact enterprise co-defendants, directing their unlawful activities through, to, and from, Washington, D.C.—utilizing the laws and protections afforded those conducting business in Washington, D.C., through Williams &

Connolly, LLP, Ellen Oberwetter, and Greenberg Traurig, LLP, of Washington, D.C.

(9)   **Greenberg Traurig, LLP (Washington, D.C.)**, and its Partners, are liable, for direct participation in schemes and unlawful activity proximately and directly causing damage to Plaintiffs' business and property interests.  These Defendants exerted, and continue to exert, agreed upon control of their associated-in-fact enterprise with and/or for their named Co-Defendants, and their non-defendant enterprise associates. These defendants act, and have acted, in concert with, for, and in agreement with associated-in-fact enterprise co-defendants, directing their unlawful activities through, to, and from, Washington, D.C.—utilizing the laws and protections afforded those conducting business in Washington, D.C., through Williams & Connolly, LLP, Ellen Oberwetter, and Greenberg Traurig, LLP, of Washington, D.C.

(10)   **UNION ANDINA de CEMENTOS S.A.A.**, and **Ricardo Rizzo Patron**[2], are liable, for direct participation in schemes and unlawful activity proximately and directly causing damage to Plaintiffs' business and property interests.   These Defendants exerted, and continue to exert, agreed upon control of their associated-in-fact enterprise with and/or for their named Co-Defendants, and their non-

---

[2] Ricardo Rizzo Patron is Ricardo Cesar Rizo Patron de la Piedra as captioned.

defendant enterprise associates.  These Defendants are joint residents of Lima, Peru, and retain dual residency in the continental U.S. conducting financial and business transactions on a daily basis.  These Defendants control U.S. assets, American Depository Receipts, cash and cash equivalents of approximately $500,000,000.00 throughout Arizona, New York, and Washington, D.C.  These Defendants retain Washington, D.C. based counsel, in cover of their unlawful activities described throughout.  These Defendants have acted through Washington, D.C. based counsel, including, but not limited to Alston Byrd, in association with Greenberg Traurig, since directing their unlawful activities against Plaintiffs assets, business and property interests in 2003.  These Defendants have committed overt acts against Plaintiffs business and property interests also in 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014.

<u>Fed.R.Civ.P. 9(b)—III (a)</u>

(11)   Defendants' fraudulent schemes are all, or substantially all, detailed in official court records, in both state and federal dockets. The 'who—what—where—when—why', if argued at all, will require Defendants' expungement of the official records, to the extent not already virtually scrubbed by Defendants. Defendants mail in the District of Columbia, to and receive from, Arizona, and email—fax—conference—video conference in use of the interstate wires from and to the District of Columbia.

## MOST RECENT PREDICATE RICO ACTS—IV

(12)   Plaintiffs had charged a few of the present Defendants with violating Arizona's Anti-Racketeering Statutes and Criminal Code. The matter was filed on November 5, 2013, in Maricopa County Superior Court. Allegations, facts, claims, and counts were brought under A.R.S. § 13-2314.04 against Defendants Osborn Maledon, Dickinson Wright/Mariscal Weeks, Greenberg Traurig, LLP, and a wholly owned subsidiary (Drake—U.S., Arizona) of Peruvian cement manufacturer Defendant UNION ANDINA *de* CEMENTOS SAA.

(13)   The suit was given to the Hon. Kathleen Cooper. The suit involved allegations of judicial cover-up of illegal racketeering conduct by Defendants, acting through a couple of Arizona District Court and Arizona State Court Judges, who were, in turn, acting in concert with Defendants to launder and 'expunge' the illegal acts. The Judicial/Lawyer associates acted in agreement to 'pardon' one-another from their chargeable open-ended conduct, spanning August 30, 2010 through January 31, 2014.

(14)   The Arizona Federal Judges at issue are Mary H. Murguia (currently sitting on the 9th Circuit—Phoenix Office) and Susan R. Bolton (currently sitting on the Arizona District Court—Phoenix). The Arizona State Jurists include William O'Neil (Presiding Disciplinary Court Judge—Arizona) and retired Civil Presiding Judge Colin F. Campbell—senior partner for Defendant Osborn Maledon, P.A.

(15)   The State criminal statutes Cooper was to consider, and material here, included: A.R.S. § 13-1804 (theft by extortion), A.R.S. § 13-2605 (Commercial Bribery)—A.R.S. §§ 13-2407—(Obstruction of Public Administration—Tampering with public records)—13-2409—(Obstructing Criminal Investigations)—A.R.S. § 13-2603 (Trading in Public Office)—A.R.S. § 13-2602 (Bribery of a public servant)—A.R.S. § 13-2606 (Offer to exert improper influence on public officer)—all are Arizona Class 6-4 felonies carrying incarceration terms of more than one year.[3]

<u>The Hon. Katherine Cooper—IV (a)</u>

(16)   Defendants filed Motion(s) to Dismiss, Motions to Strike, and, Applications for 'Administrative Orders' declaring Plaintiffs 'vexatious litigants'. All defense motions and 'Administrative Orders' skipped the fact that none of the Complaint's facts, allegations, claims, or counts were, or could have been, 'litigated' retroactively within Arizona's 3-year statute of limitations applicable to A.R.S. §13-2314.04.[4]

---

[3] 18 U.S.C. §§ 1961 (1) "racketeering activity" means (A) any act or threat involving ... bribery, extortion, ... , which is chargeable under State law and punishable by imprisonment for more than one year ...

[4] Plaintiffs framed unlawful conduct arising out of a Preemptive Strike Order issued by Arizona District Court Judge Murguia on **March 21, 2011**; a 'dismissal' of four Vulnerable Adult suits contracted through Goodman, representing the Vulnerable Adults on federal constitutional torts *against* the Vulnerable Adults, by their fiduciaries and Osborn Maledon. The 'dismissals' were without citation to federal law—or any law at all, under 18 U.S.C. § 1961-1968 and 42 U.S.C. § 1983, on an 'Order to Show Cause' for disbarment on **April 7, 2011**; Signed Judicial Affidavits for Disbarment of **June 9, 2011**—signed by Judge Murguia on **June 9, 2011, repeating verbatim, her March 21, 2011 order (See, <u>infra</u>. at IV(b), ¶¶24-34);** and introduction of the Murguia

(17)   On these defenses, Plaintiffs filed 4 Motions for Summary Judgment, 4

Statements of Fact, and, 2 Motions for Injunctive Relief. Plaintiffs also filed for

Supplemental Proceedings and an Administrative Order. Defendants' initial group

of Motions were filed and entered into the official record on December 2-5, 2013.

Plaintiffs' responses and Motions for Summary Judgment were filed and entered

into the official *TurboCourt*[5] record and docket, within a week, on December 10-

11, 2013. Injunctive relief requests were filed and entered on December 18, 2013.

---

federal proceedings into Disbarment Proceedings under the Hon. William O'Neil on **February 6-
7, 27-28,** and **March 2, 2012.** After 24 months, on or about **August 2013,** the Hon. Susan R.
Bolton, refused a hearing, despite written request in **August 2011,** on O'Neil's **July 21, 2011** five-
year 'TRO' issued without cause, without a hearing, without notice, without evidence, and without
cross-examination. O'Neil also made a recorded record on **December 9-11, 2013** (See, <u>infra.</u> at
IV (d) ¶¶40-44).

[5] *TurboCourt* is a national electronic web-based filing, docketing, and entering system, selected
by the Arizona Supreme Court, by rule, as the only official record—electronic or otherwise.
*TurboCourt* wires transgress all states and servers, and for Arizona, usually interstate through
California. By Arizona Supreme Court Rule, all attorneys, judges, and staff for each—must use
the *TurboCourt* electronic official record for filing and official entry, date and time stamped, typed
always in the upper right hand corner of the document reflecting the post-stamped document as
part of the official record. There are no handwritten markings interfering with the official record
typed date and time stamp. This process is normally completed within a couple of hours from
initial filing. *TurboCourt* personnel do not enter date and time stamped official records from
Friday afternoon, through the weekend, until Monday morning. Plaintiffs, in the Cooper
assignment, electronically noticed all Defendants of their filings, without official stamp, upon
initial filing. *TurboCourt* would then electronically **notice** the document to all defendants—and
require for acceptance of **e-service that each recipient 'click' on the notice for electronic e-
service,** to review and archive the electronic filing. **Defendants mailed** their filings to Plaintiffs
and did not ever attempt to e-serve the plaintiffs. All court orders, minute entries, and rulings are
filed electronically with *TurboCourt*—electronically date and time stamped on entry—**and
mailed**—to all plaintiffs and defendants. All computers or servers interacting with *TurboCourt*
leave digital fingerprints upon access—upon typing or 'clicking' on the *TurboCourt* interface, and
reflect the time and dates of interaction—all preserved on Plaintiffs, Defendants, and Court (Judge

(18)   On December 30, 2013, Defendants moved for a '*continuance*', electronically through ***TurboCourt***, and through the U.S. Mail.   The basis for the *Motion to Continue* stated that none of the defendants had been served, electronically or otherwise, with Plaintiffs' Motions for Summary Judgment and Statements of Fact. Plaintiffs never, at any time material, sent courtesy electronic copies of their filings to any defendant outside of ***TurboCourt***. Defendants' 30-day responses, if any, to Plaintiffs' Motions for Summary Judgment were due on January 9-10, 2014. Defendants did not file or enter a proposed order—or any order—anywhere at any time on December 30-31, 2013, or on January 1-31, 2014, or on February 1-10, 2014.

(19)   In 2:13-CV-01129-SRB at docket #73, filed **12.20.2013**, discussed <u>infra</u>, Defendants lodged 200 pages of Plaintiffs' Motions for Summary Judgment and Statements of Fact—without ***TurboCourt*** date and time stamps already part of the official record well before December 20, 2013—because Defendants had accepted e-service of the documents upon Plaintiffs' filings—which are not date and time stamped—by 'clicking' on the acceptances of e-service among all defendants—over 100 times. Defendants, in these two federal and state proceedings, committed wire fraud and mail fraud concurrently. Defendants' attempts to perpetuate the fraudulent

---

Cooper) computers and server architecture. ***TurboCourt*** likewise cashed the same electronic information. Court entries, minute entries, orders, and rulings—when filed and entered through ***TurboCourt***, automatically initiates a Clerk of the Court mailing on the same date reflected on the electronic date and time stamp.

schemes to alter the official record were electronically filed, interstate, by Defendants, in both cases. Defendants here, also mailed the fraudulent schematics. Plaintiffs have kept—unopened—Defendants mailings from June 2013 through February 10, 2014, as original evidence.  The mailings, electronic filings, and electronic e-service acceptances, comprise in excess of 200 discrete predicate acts of wire and mail fraud.

(20)   On January 7, 2014 and January 10, 2014, Defendants filed and entered a notice and unrelated motion. There were no other filings or entries on January 6 through Sunday the 12th. Cashed screen shots of the official record reflect the same. On Sunday night, the 12th, a 'filing' is made. The filing was on Defendant Osborn Maledon letterhead and purported to be a proposed order—'signed' by Judge Cooper on 'January 6, 2014'—in two discrete handwriting samples. The 'order' was not filed or entered into the official *TurboCourt* record through *TurboCourt* on a Sunday night, the 12th of January—without an official entry electronic date and time stamp.

(21)   The filing of the 12th was reordered to show a 'filing' on the 8th of January— one day before Defendants' responses to Plaintiffs' Motions for Summary Judgment were due. Because Defendants with Ms. Cooper had, without authorization, subverted the official filing and entry electronic record, the Clerk of the Court could not mail the 'court order' on January 6th through January 31st—or at any time. All

other court orders, rulings, and minute entries were mailed to Plaintiffs and Defendants, on the date electronically stamped on the court entries.

(22)   Cooper, according to the official electronic record, did not have a proposed order—or any order—in her possession on January 6th ('signature' date) or on the 7th, or the 8th (backdated 'filing') or on January 9-12, 2014—until Sunday night. Cooper in *ex parte* extrajudicial manner was hand-delivered the Osborn Maledon letterhead 'order' by Defendants, off the record, backdated to January 6, 2014, filed on Sunday the 12th, and back-filed to January 8, 2014. On January 13, 2014, Plaintiffs moved to notice Cooper as a matter of right and venue transfer the case to a logical contiguous county.

(23)   The notice reflected the same facts referenced above. Cooper denied the Change of Judge because she claimed that the '*Motion for Continuance*' 'order' was actually 'entered' on January 6, 2014—in an unspecified extrajudicial official record—or in any record at all. On January 25, 2014 Plaintiffs lodged a Change of Judge for Cause and Affidavit. Upon filing the Affidavit, Judge Cooper could act no further. On January 28, 2014, the Presiding Civil Judge also divested the court of any pretense to jurisdiction by court order—electronically stamped and mailed. On January 31, 2014, Cooper plied the record with an additional 3 orders. These 'orders' were electronically filed and entered into the official record by date and time

1  stamp—and mailed in six (two plaintiffs) separate mailings to Plaintiffs, along with

2  mailings to Defendants on January 31, 2014.

### The Hon. Mary Murguia—IV (b)

(24)  Federal District Court Judge Mary H. Murguia approvingly ordered a

voluntary dismissal without prejudice after oral argument of August 30, 2010. And,

then sanctioned Goodman for more than $130,000.00, in part, based on her own

dismissal. The financial windfall inured to Judge Murguia's long-time associates and

political advisors at Williams & Connolly, LLP, with whom Murguia has associated

for 20 or more years. Judge Murguia did not disclose her position as a Williams &

Connolly confidant, nor did Murguia disclose her contacts, communications,

connections, and extra-judicial contacts with Williams & Connolly, LLP, William

Maledon, or Greenberg Traurig, LLP.

(25)  Murguia copied, on March 21, 2011, word for word, a Williams & Connolly

suggestion of 'inherent authority' electronically/mail published and filed six months

earlier at Docket #212 (September 14, 2010).  At instruction and in concert with

Williams & Connolly, Dickinson Wright/Mariscal Weeks, and Greenberg Traurig,

LLP, Judge Murguia cut and pasted, in total, Williams & Connolly's and Greenberg

Traurig's fabrications into a sanctions order dated March 21, 2011. Thereafter in

April-May and June of 2011, Murguia, Williams & Connolly, Oberwetter,

Greenberg Traurig, LLP, Mariscal Weeks, Maledon, were given the opportunity to

retract their concerted and intentional falsifications of the record. On behalf of defendants and herself, Murguia, by amended order, ratified the fictions on or about July 26, 2011.

(26)  Judge Murguia: (a) deliberately and materially misquoted the record and filed documents, by intentional deletion of the record, by altering the record, and filed documents by obstructing the proceedings captured in the Official Reporter's Transcript of Proceedings, by page and line number.

(27)  Murguia wrote at page 5 of her March 21, 2011 Preemptive Strike Order that Goodman dispensed with U.S. Supreme Court RICO requirements of a 'direct injury to property or business', also citing Goodman's brief at Docket 187, page 5, and oral argument of August 30, 2010, at page 42, as clear proof of 'bad faith'. The case at issue: *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008): The transcript actually states at page 42, line 3, relative to *Bridge v. Phoenix Bond & Indemnity*; 'Contrary to the allegations [arguments made by defense counsel] of privity, contractual privity, detrimental reliance, public statements, direct first-party reliance, the Supreme court laid to rest once and for all those frivolous arguments. There is no contractual privity required.' There was no commentary by Goodman rewriting the element of direct proximate cause. Murguia, in concert with defendants, altered the Official Reporter's Transcript and rewrote Goodman's federal filings to obstruct the federal proceedings.

(28)   Murguia purposely altered the record intentionally overwriting the transcript to reflect her scripted dissembling. In Docket #187 Williams & Connolly, Oberwetter, Murguia, Mariscal Weeks, Greenberg, along with Maledon, electronically deleted Goodman's truthful articulation of the case holdings from the electronic docket and record. The court's Preemptive Strike Order of March 21, 2011 at page 5 schematically misstates the law, and record, referencing docket 108 on removal and remand under the probate exception. Judge Murguia sanctioned Goodman for the '…failure to cite any authority to support removal, but [sic] blatantly mischaracterized the holding of *Marshall v. Marshall*, 547 U.S. 293 (2006)….' The 'blatant mischaracterization' was Goodman quoting two pages of U.S. Supreme Court Justice Ginsburg's constricting examination of the probate exception. Murguia's positions on the probate exception and removal/remand were espoused with complete knowledge of the law of the Ninth Circuit conforming to Goodman's analysis as she declined to adopt Ninth Circuit controlling unpublished precedent she was required to follow in at least three other Ninth Circuit opinions.

(29)   Judge Murguia went even further 'quoting' from the Sixth Circuit. (See Murguia March 21, 2011 Order at n.4 citing *Wisecarver v. Moore*, 489 F.3d 747, 749 (6th Cir. 2007)). The Judge deliberately distorted the opinion by intentional elimination of ninety percent (90%) of the case. Murguia's written departures of record represented expressly overruled positions on the continued vitality of the

'Probate Exception'. In other words, Murguia expressly misrepresented the case holding. And, then awarded cash to her associates for her disingenuous alteration of the record. The Sixth Circuit in reality, demolished the 'Murguia Exception' to the 'Probate Exception' by citing U.S. Supreme Court controlling precedent, *Marshall v. Marshall*, 547 U.S. 293 (2006) (Court chiefly curtailed the 'probate exception' requiring non-probate causes of action to be heard as a matter of primary federal jurisdiction unencumbered by state court usurpation of federal causes of action, or pendent state law claims non-justiciable in state probate courts—the concurrence suggested laying the 'probate exception' in an adjacent grave next to the Rooker-Feldman doctrine.).

(30)   The Sixth Circuit also took pains to underscore sister circuit authority corroborating its restrictive analysis of the probate exception. Judge Murguia refused to accept multiple Ninth Circuit cases *cited by the Sixth Circuit in Wisecarver v. Moore*, supra, as a correct statement of the law (See, e.g., *Campi v. Chirco Trust*, 223 Fed. Appx. 584 (9th Cir. Feb. 27, 2007) (cause of action alleging fraud, undue influence, and breach of fiduciary duties regarding property removed from a trust and never probated not barred by probate exception)

(31)   Murguia continued in the same vein at page 6 of the Preemptive Strike Order of March 21, 2011. Judge Murguia rattles off a list of 'misrepresentative' cites on securities fraud, RICO, and standing to pursue both. Murguia wrote that Goodman

admitted the points. Judge Murguia, at page 65 of the Reporter's Transcript of August 30, 2010, quoted, without more, that Goodman admitted '...they are correct....' The Murguia record deletions actually read: 'Every issue was addressed, and there is case law that supports the Blue Chip theory. And they are correct, in the purchase or sale, that's not what we are doing here. We are going after the intentional conduct, the racketeering conduct. **And for the purposes of this argument, I can use the private placement memorandums that were never purchased or sold as evidence of racketeering conduct and intent.** I don't need to use the securities fraud count. And I can withdraw that.'

(32)   Judge Murguia's plagiaristic analysis conservatively reversed and rewrote approximately twenty-three (23) case holdings from most Circuits, including the Ninth Circuit, and all U.S. Supreme Court citations to favor her associates at Goodman's expense—literally.

(33)   Murguia will admit that she possessed, reviewed, read, and understood the Official Reporter's Transcript of Proceedings of August 30, 2010. Murguia will admit that before the August 30 hearing she understood and had the requisite state of mind to dissemble and obstruct the proceedings by repetitively interrupting with immaterial 'questions' after repeatedly receiving the correct information as a matter of law, at oral argument and in briefings of record.

(34)   Murguia's agenda, as with the rest of the enterprise, was to obstruct the federal proceedings, to reword briefings by falsifying the record, and to reject overarching federal public policy to reflect her personal animus, while intentionally erasing and falsely inserting language into federal documents and Official Transcripts. The revisions were known by her to be patently false.

### The Hon. Susan R. Bolton—IV (c)

(35)   Judge Bolton has been electronically 'randomly' selected as a matter of court rule, for Plaintiff, since 2003. This random process required Plaintiff to appear before her in 2003, 2005, 2009, 2011, 2012, 2013, and 2014.

(36)   On June 4, 2013 Plaintiffs filed an action against some of the same defendants here. Defendants each claimed lack of proper service, defective service, and argued that under FRCP 12(b)(1)(2)(4)(5) that the court lacked jurisdiction to proceed. Each defendant 'joined' one another and filed separate 12(b) motions. Judge Bolton set the case aside for over 180 days. After 6 months had lapsed Judge Bolton issued an 'order' dismissing the case. Judge Bolton failed to explain her conduct in light of Defendants' 12(b)(1)(2)(4)(5) service and jurisdictional issues. Judge Bolton had no jurisdiction to proceed as she defaulted to defendants 12(b)(1)(2)(4)(5) failure to obtain personal jurisdiction. Due to Bolton's unavailability for 6 months, Plaintiff filed a mandamus requesting her recusal under 28 U.S.C. § 455(b)(1)(2)(3) and (e),

and for direct referral to the Chief Judge under local rule. Bolton never timely responded either way.

(37)   Two months post-'dismissal', on January 28, 2014, and 7 months post-12(b)(1)(2)(4)(5) notice of lack of personal and subject matter jurisdiction, insufficiency of process, and, insufficiency of service of process, Judge Bolton issued a no-hearing, no specificity 'vexatious litigant' label under the All Writs Act 28 U.S.C. § 1651. Judge Bolton had no 'inherent authority' or supplemental jurisdiction to 'order' anything. Judge Bolton did manage to deflect Plaintiffs' Motion for Summary Judgment at day 28 of 30, within which defendants were required to respond—based on 'Local Rule 7.3'—which does not address in any manner a Summary Judgment untimely response.

(38)   To further obfuscate the record Bolton cited no authority which sanctioned this unilateral and singular federal court departure from U.S. Supreme Court rule making authority under Rule 56. Bolton's excuse was 'judicial economy'. Bolton stated she wanted to concentrate on defendants motions to dismiss under 12(b)(1)(2)(4)(5). She never did.

(39)   Bolton's 'dismissal', All Writs Act filing, and the summary judgment removal are examples, not of Bolton's authority, but of her absolute lack of jurisdiction to proceed—on any basis. The filings reflect Bolton's extrajudicial bias in providing a cover up for defendants' unlawful conduct, and Bolton's use of extortion under the

All Writs Act. Despite the extraordinary breadth and range of defendants criminal conduct—Bolton engaged in knowing cover-up, obstruction, honest services fraud, bribery (federal and state), extortion (federal and state), dissembling on defendants unprotected RICO conduct—apparently as a matter of Arizona federal preemption.[6]

## The Hon. William O'Neil—IV (d)

### Professional Check Kiting Scheme as Officer(s) of the Court

(40)   Plaintiffs shall introduce excerpts from the Official Recorded Record from Administrative Law Judge O'Neil's forum, taken on December 9-11, 2013. Those recordings of record admit knowledge, intent, aiding and abetting and intentional obstruction, as alleged throughout the Complaint. Specifically, on December 10, 2013, Defendant Geoff M.T. Sturr with Defendant Colin F. Campbell, admitted to a check kiting scheme for Goodman professional services in the amount of $15,000.00. These officers of the court admitted covering up a false pretense scheme perpetrated on Wells Fargo bankers in the amount of $100,000.00. These State Bar witnesses never explained their obstruction in cover of intentional

---

[6] The Bolton 'order' is void and/or voidable on other substantive constitutional grounds, including Bolton's refusal to honor an absolute mandate to venue transfer, or transfer the case, under 28 U.S.C. § 455(a)**(b)(1)(2)(3)** and (e). Recusal is mandatory under 28 U.S.C. § 455(b)(1)(2)(3). (See, lodged: Statement(s) of Fact on Plaintiffs Motions for Summary Judgment.).

misrepresentations which falsely claimed a Goodman 'power of attorney' *in lieu* of a mandatory, but missing, endorsement on the 'deposit' of $100,000.00.

(41)   Sturr, Campbell, and associated-in-fact member Osborn Maledon, swore (Sturr 'affirmed') their undisclosed association, review, and knowledge of the check kiting scheme on or about December 9, 2009. Sturr and Campbell refused responsibility and repayment for indemnification of $50,000.00 in outstanding ERISA Blue Cross-Blue Shield of California health care expense warranted for repayment.

(42)   Sturr and Campbell claimed there were no written billing records related to their 'representation' done in the spirit of *pro bono* obligations. State Bar witness Brooks ('represented' by Campbell—Sturr—Osborn Maledon) is asked by the state to detail his 'damages', presumably in association with his check kiting schemes related to Campbell and Sturr. Brooks claimed he owed Sturr and Campbell $45,000.00 for their *pro bono* services—which he had been diligently repaying over the last 4 years. Brooks admitted he owed, as a matter of contract and law, at least $50,000.00 in ERISA benefits previously denied by Brooks/Sturr/Campbell— Brooks claimed to be working down that denied debt over the last four years as well—with the help of 'loans' from family and 'friends'.

(43)   Defendants Sturr and Campbell stripped official records of the authenticated records of the 'NSF' $15,000.00 Brooks' payment for professional services.

Defendants Sturr and Campbell removed official records of Brooks' false pretense

$100,000.00 'deposit', removed from the record fraudulent claims of a "Goodman

power-of-attorney", and altered the record before a complicit 'Administrative Law

Judge'.

(44)   On **July 31, 2011** Judge William O'Neil entered a permanent injunction (5

years) against Goodman based on the Murguia 'judicial affidavit'—without hearing,

without notice, without confrontation, without evidence presentation or an

opportunity to respond. A year after-the-fact, the sworn testimony incorporated here

and contained within the Appendix evidences judicial, prosecutorial, and fiduciary

obstruction, extortion, and racketeering conduct consistent with Counts I through VI

infra.

UNION ANDINA *de* CEMENTOS S.A.A., and Ricardo Rizzo Patron--V

(45)   Plaintiffs had, by January 2003, developed real property and assets related to

concrete production, transportation, and mining. Plaintiffs' then Bank, Comerica,

had valuations of the real property at $40,000,000.00. The hard assets were valued

by the Bank at an additional $20,000,000.00. Plaintiffs were then clients of

Defendant Greenberg Traurig, LLP. Greenberg Traurig also represented Comerica

Bank. Greenberg Traurig had performed the valuations through the Bank appraisers.

On or about August 20, 2003, Greenberg Traurig entered into written agreements

with Defendant Patron, as CEO of Cementos Lima (predecessor by merger into

UNION ANDINA *de* CEMENTOS SAA) in a fraudulent scheme to liquidate Plaintiffs assets to Cementos Lima. Defendant Dickinson Wright/Mariscal Weeks were in agreement as well. Dickinson Wright/Mariscal Weeks, Greenberg Traurig, and Patron, had been emailing one another in December 2002, into January and throughout 2003-2014 related to the scheme.

(46)   Plaintiffs knew nothing of the scheme, emails, mailings, or obstruction, until approximately 2008. Judicial obstruction relative to the scheme was confirmed through the conduct of Judge O'Neil on or about July 21, 2011, December 9-11, 2013, and January 13, 2014. Judge Bolton's obstructive conduct was filed as an official record on January 18, 2014. Judge Bolton's obstruction was also evidenced on August 24, 2013. Judge Cooper's record alterations were evident on January 12, 2014—Sunday night. Judge Cooper affirmed her judicial obstruction, bribery, extortion, and record reconstruction on January 27, 2014, and three more times on January 31, 2014. Judge Murguia affirmed her associated-in-fact status on March 21, 2011, and again on June 9, 2011, and again on July 26, 2011.

(47)   By January 2003, Plaintiffs had also developed cement production assets, real property and hard assets, and cash. Plaintiffs were at all times guarantors, sureties, and controlled the cement production assets as with the concrete production assets referenced above. Plaintiffs Bank, Comerica, through Defendant Greenberg Traurig, retained and performed audits, appraisals and valuations of the cement production

assets at just over $134,000,000.00. Water rights at $50,000,000.00 were not included in the appraisals. Transferring the assets to Defendants UNION ANDINA *de* CEMENTOS SAA S.A. and Patron were through agreement with Greenberg Traurig, Defendants Dickinson Wright/Mariscal Weeks, Osborn Maledon, and in 2010 with Williams & Connolly.

(48)   Title transferred in December 2003 through Defendant Michael S. Rubin and Dickinson Wright/Mariscal Weeks.[7] Published on Monday, 27 June 2011 14:03 it was announced: "Cementos Lima, S.A., Peru; Officials of the Southwest's newest integrated player held a mid-June grand opening for a $300 million, 600,000-plus tons/year capacity cement plant in northern Arizona. More than 10 years in the making, Drake Cement is located in Yavapai County, near the historic rail town of Paulden and 35 miles north of Prescott. Arizona's first greenfield mill in more than 50 years will reduce the state's need for imported cement materials, which at the 2005-06 peak reached 50 percent of market consumption. Its high capacity, rail switching line along the BNSF mainline, plus proximity to Interstate 40 and (Phoenix-Las Vegas) U.S. 93 corridors, will enable Drake Cement to ship powder at competitive transportation rates. The launch caps the U.S. arrival of Cementos Lima, Peru's largest cement producer. ***These operations overlap those of CalPortland Co.,***

---

[7] Dickinson Wright/Mariscal Weeks absorbed Mariscal Weeks McIntyre & Friedlander, P.A. in 2013—along with their liabilities, Michael S. Rubin.

whose 1.4 million ton/year Rillito, Ariz., plant is the market's main cement source. Cementos Lima has a 90 percent stake in Skanon Investment Inc., which in turn has an 89 percent interest in Drake Cement and Drake Materials. Another Cementos Lima subsidiary, Transportes Lurin S.A., is pursuing a $50 million cement terminal in Staten Island, N.Y., scheduled for operation by 2013."

(49)   Defendants UNION ANDINA *de* CEMENTOS SAA and Patron's '… first greenfield mill in more than 50 years …' was on Plaintiffs real property, owned in fee simple—in Paulden—along with Plaintiffs' patented mining resources representing 96% limestone purity—on 3,000 acres—representing 1,000 years of production capacity for an annual '600 ton' cement production facility—on a main railway line located in the heart of the fee simple property—with Plaintiffs' water strike on the fee simple property representing one of the state's largest private reserves of water. Defendants even copied Plaintiffs state and federal permitting down to the last stockpile. Defendants' scheme and conspiracy were complete upon Defendants published valuation of $300,000,000.00 on June 27, 2011.

(50)   These Defendants concealed their financial transactions, money laundering, and agreed conspiracies with Defendants Greenberg Traurig, Osborn Maledon, Dickinson Wright/Mariscal Weeks, with Williams & Connolly, through the Washington, D.C. firm, Alston Byrd.

(51)   UNION ANDINA *de* CEMENTOS SAA operates non-competitively with California Portland Cement by contract and agreement, to control approximately 80% of the Arizona market for cement, resulting in the highest prices for cement in the continental U.S. None of the 'efficiencies' touted by the above press release inure to Arizona, or any other specific market. The high cost is passed on to the purchasing public through much higher concrete costs used in all residential and commercial buildings. These artificially high prices result in a book value of $300,000,000.00 for Plaintiffs' assets.

DEFENDANTS' SHAM/FRAUDULENT BANKRUPTCY SCHEMES—VI

(52)   By December of 2003, Defendants Greenberg Traurig, Dickinson Wright/Mariscal Weeks, with the UNION ANDINA *de* CEMENTOS Defendants made filings before the Federal Courts alleging perfection of security interests in all of Plaintiffs' assets, then valued by Defendants and their associated Bank, Comerica, at roughly $60,000,000.00, the amount of Plaintiffs guaranteed debt. Defendants claimed entitlement to the Plaintiffs' cement production assets (d/b/a Stirling Bridge Cement), then valued by Comerica and Defendants at $134,000,000.00. Through cross-default contract provisions Defendants filed Federal documents claiming first priority secured status on the Stirling Bridge $134,000,000.00 as well.

(53)   By December 2003 these same Defendants had filed in Federal Proceedings, financial documents reflecting that Plaintiffs had purportedly filed falsified

financials. These 'financials' were taken from Plaintiffs' servers by Greenberg Traurig, and Dickinson Wright/Mariscal Weeks in July 2002. Plaintiffs learned at a deposition of IT specialists in 2006 that the servers were 'scrubbed' to attempt elimination of the electronic thefts. These IT specialists explained that though they scrubbed the servers that is was on Defendants 'instruction'. The 'financials' were also scrubbed—of approximately $10,000,000.00 in deposits. The scheme was intended to accelerate liquidation of Plaintiffs' assets and to make it appear as though Plaintiffs were concealing assets and laying waste to their own companies. The assets were liquidated within 6 months—to and through Defendants Greenberg Traurig, Dickinson Wright/Mariscal Weeks, and the UNION ANDINA *de* CEMENTOS Defendants.

(54)   Defendants filed false, stolen, and altered plaintiff financials and forged UCC security interest filings. The false and fraudulent federal filings by Defendants are RICO violations of under 18 U.S.C. §152.[8]   Defendants, despite claiming the

---

[8] § 13-1804. **Theft by extortion**; A. A person commits theft by extortion by knowingly **obtaining or seeking to obtain property or services** by means of **a threat to do in the future** any of the following:  3. **Cause damage to property.** 4. **Engage in other conduct constituting an offense.** 5. **Accuse anyone of a crime** or bring criminal charges against anyone. 6. Expose a secret or an asserted fact, **whether true or false**, tending to **subject anyone to hatred, contempt or ridicule** *or* to **impair the person's credit or business.** 7. **Take or withhold action as** *a public servant* or *cause a public servant to take or withhold action.* 8. **Cause anyone to part with any property.**

     C. Theft by extortion as defined in subsection **A, paragraph 1 is a class 2 felony.** *Otherwise, theft by extortion is* a **class 4 felony**.

contrary in federal proceedings, were **never perfected** on **$178,000,000.00** of Plaintiffs' assets. Defendants each concealed, fabricated, and altered documents in federal proceedings to accelerate liquidation of Plaintiffs' assets to themselves.[9] [10]

(55)   Additional predicate acts include Greenberg Traurig's admission that, in writing, that they 'swiped Goodman's 250k...' of Plaintiffs' cash in the middle of federal proceedings. Defendants also wrote that they 'swiped' approximately $500,000.00 from Goodman accounts, without notice or documentation, within 90 days of the filing. On or about August 7-9, 2007 Greenberg Traurig 'settled' the fact that they had tampered with, suborned perjury, through the introduction of altered and falsified official records with and through federal bankruptcy fiduciaries and examiners. Plaintiffs' assets had been liquidated to Defendants 4 years prior. The

---

[9] § 13-2602. **Bribery of a public servant or party officer**; A. A person commits bribery of a public servant or party officer if with corrupt intent:

1. Such person **offers, confers or agrees to confer any benefit upon a public servant** or party officer with the **intent to influence the public servant's** or party officer's vote, **opinion, judgment, exercise of discretion** or other action in his official capacity as a **public servant** or party officer; or

2. While a public servant or party officer, **such person solicits, accepts or agrees to accept any benefit upon an agreement or understanding** that his vote, **opinion, judgment, exercise of discretion or other action as a public servant** or party officer may **thereby be influenced.**

C. Bribery of a public servant or party officer is a **class 4 felony.**

[10] A.R.S. § 13-2606 (2013)

§ 13-2606. **Offer to exert improper influence on public officer or employee;** A person who **intentionally or knowingly obtains or seeks to obtain any benefit from another person upon a claim or representation that he can or will improperly influence the action of a public servant** is guilty of a **class 4 felony.**

defendants are independently liable for their individual and concerted racketeering activity, or in conspiracy to impair and frustrate the uniform laws in bankruptcy under, among other things, 18 U.S.C. § 152(1)(2)(3)(4)(5)(6)(8).

## Count I

(56)   Plaintiffs reincorporate all prior paragraphs into this count. Plaintiffs' charge Defendants Williams & Connolly, Ellen Oberwetter, Greenberg Traurig, Osborn Maledon, William Maledon, Geoff M.T. Sturr, Colin F. Campbell, Dickinson Wright/Mariscal Weeks, Michaels S. Rubin, and the UNION ANDINA *de* CEMENTOS Defendants under 18 USC § 1962(a)(b)(c) and (d) (in conspiracy with one another and their specified associated-in-fact judicial members of the enterprise).

## Count II

(57)   Plaintiffs reincorporate all prior paragraphs into this count. Plaintiffs' charge Defendants Williams & Connolly, Ellen Oberwetter, Greenberg Traurig, Osborn Maledon, William Maledon, Geoff M.T. Sturr, Colin F. Campbell, Dickinson Wright/Mariscal Weeks, Michaels S. Rubin, and the UNION ANDINA *de* CEMENTOS Defendants under18 U.S.C. §§ 1961 et seq., (1) "racketeering activity" means (A) any act or threat involving ... **bribery, extortion**, ... , which is chargeable **under State law** and punishable by **imprisonment for more than one year**; (B) any act which is indictable under any of the following provisions of title 18, United

States Code, which pertain under the above operative facts: ... [18 USCS § 1341] (relating to mail fraud), [18 USCS § 1343] (relating to wire fraud), [18 USCS § 1503] (relating to obstruction of justice), ...   [18 USCS § 1512] (relating to tampering with a witness, victim, or an informant), [18 USCS § 1513] (relating to retaliating against a witness, victim, or an informant), [18 USCS § 1951—Hobbs Act] (relating to interference with commerce, robbery, or extortion), section 1952 [18 USCS § 1952] (relating to racketeering).

Count III

(58)  Plaintiffs reincorporate all prior paragraphs into this count. Plaintiffs' charge Defendants Williams & Connolly, Ellen Oberwetter, Greenberg Traurig, Osborn Maledon, William Maledon, Geoff M.T. Sturr, Colin F. Campbell, Dickinson Wright/Mariscal Weeks, Michaels S. Rubin, and the UNION ANDINA *de* CEMENTOS Defendants with violating the Hobbs Act (18 USC 1951(a)(b)(2)(3), and which includes the judicial extortionate conduct in association with Defendants, under '... color of official right ...' described throughout. Defendants also violate D.C. Code § 22-3251; Extortion (a). These associated-in-fact jurists and their enterprise extinguished Plaintiffs law business and contractual property interests in the Vulnerable Adult cases at $7,500,000.00; in the *Summit v. Greenberg Traurig, et al.*, at $10,000,000.00; and punitive and unlawful 'fines' sent to the jurists associated-in-fact with these Defendants, and to these Defendants in the amount of

$700,000.00. Plaintiffs assets, hijacked by Defendants and their associated jurists also include the concrete production assets of $60,000,000.00 (amount guaranteed), and of the cement production assets (guaranteed) then valued by Defendants at $134,000,000.00—now valued by Defendants at $600,000,000.00.

## Count IV

(59)   Plaintiffs reincorporate all prior paragraphs into this count. Plaintiffs' charge Defendants Williams & Connolly, Ellen Oberwetter, Greenberg Traurig, Osborn Maledon, William Maledon, Geoff M.T. Sturr, Colin F. Campbell, Dickinson Wright/Mariscal Weeks, Michaels S. Rubin, and the UNION ANDINA *de* CEMENTOS Defendants with violating [18 USCS § 1341] (relating to mail fraud), [18 USCS § 1343] (relating to wire fraud), [18 USCS § 1503(a)] (relating to obstruction of justice), ...   [18 USCS § 1512(b)(1)(2)(3)(c)(1)(d)(f)(g)(h)(i)] (relating to tampering with a witness, victim, or an informant), [18 U.S.C. § 1513(e)(f)] (relating to retaliating against a witness, victim, or an informant). The obstruction statute explicitly provides that "an official proceeding need not be pending or about to be instituted at the time of the offense." § 1512(f)(1). This Count assumes violators as attorneys and judges would reasonably expect their conduct to end in an official federal proceeding, like here, in examination of their obstructive conduct.

Count V

(60)  Plaintiffs reincorporate all prior paragraphs into this count. Plaintiffs' charge Defendants Williams & Connolly, Ellen Oberwetter, Greenberg Traurig, Osborn Maledon, William Maledon, Geoff M.T. Sturr, Colin F. Campbell, Dickinson Wright/Mariscal Weeks, Michaels S. Rubin, and the UNION ANDINA de CEMENTOS Defendants with violating, with their jurists: 18 U.S.C. § 1346, honest services wire fraud is in violation of 18 U.S.C. §§ 1343 and 1346; and obstruction of justice in violation of 18 U.S.C. §§ 1512(b)(3) and 1512(c)(2). *See* 18 U.S.C. § 201(c)(1)(A); It is unlawful to "transmit or cause to be transmitted" a wire communication in interstate commerce "for the purpose of executing" an existing or intended "scheme or artifice to defraud." 18 U.S.C. § 1343. To prove wire fraud: (1) the defendant 'knowingly and willingly entered [or intended to enter] into a scheme to defraud'; and (2) 'an interstate wire communication was used to further the scheme.'" A scheme to defraud includes a scheme "to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. The **Arizona State Public Obstruction statutes referenced throughout is additional statutory proof under 1346. The requisite intent to commit honest services fraud may rely upon evidence as to violations of those statutes.** §§ 1343 and 1346 as used here, criminalizes the use of interstate wires to conceal an official's material conflict of

interest. Co-conspirators, 'knowing participants in the scheme are legally liable' for their co-schemers' use of the mails or wires.

### Count VI

(61)   Plaintiffs reincorporate all prior paragraphs into this count. Plaintiffs' charge Defendants Williams & Connolly, Ellen Oberwetter, Greenberg Traurig, Osborn Maledon, William Maledon, Geoff M.T. Sturr, Colin F. Campbell, Dickinson Wright/Mariscal Weeks, Michaels S. Rubin, and the UNION ANDINA *de* CEMENTOS Defendants with violating § 1956—Laundering of monetary instruments. All Maricopa County owned computer architecture was paid for by the federal government, in large part, due to Arizona's several hundred million a year U.S. stipend allocated to the Maricopa County and State jurists, courthouses, and agencies administering such funds. Funding exceeds $10,000.00 under 18 USC 1956 as defined in 18 USCS § 666 (relating to theft or bribery concerning programs receiving Federal funds of more than $10,000.00 annually), and, 18 USCS § 1030 (relating to computer fraud and abuse). Check Kiting:  A fraudulently obtained line of credit, which results in an artificially inflated bank balance, is within the scope of the term "proceeds" as used in § 1956. The deposit of checks drawn on insufficient funds, knowingly promotes the commission of bank fraud as defined in 18 U.S.C. § 371 and § 1344.

(62)   WHEREFORE, plaintiffs incorporate by reference, one to another, all separately enumerated paragraphs above. Plaintiffs respectfully request the following damages against defendants jointly, severally, and individually:

a.   Plaintiffs' shall recover statutory treble damages according to proof at trial together with prejudgment interest. Damages were the proximate, 'but for' and direct cause of damage to plaintiffs business and property interests.

b.   Preliminary Injunction(s) against Defendants.

c.   Plaintiffs reserve the right to amend this complaint as a matter of rule, and as a matter of law, upon articulation of specific deficiencies, if any. Plaintiffs also claim under Fed.R.Civ.P. 60(d) and its Independent Action provisions.

d.   Punitive or Exemplary Damages to be proven at trial.

e.   Damage associated with the expense, cost, and professional fees (attorney, consulting, expert and otherwise) incurred in the prosecution of this matter to be proven with sufficient particularity at trial.

f.   Forfeiture of Defendants' substitute assets, trebled.


Dated this 12th of February, 2014.

/s/ Grant H. Goodman /s/ Teri Goodman

Grant H. Goodman, Teri Goodman
3104 E. Camelback Road, Suite 563
Phoenix AZ 85016
Phone: (602) 840-2393 (602) 999-9789
granthgoodman@msn.com

## VERIFICATION

This certification reflects carefully read pleadings based on a reasonable inquiry. Plaintiffs believe the following: (1) This Complaint is well grounded in fact and, (2) warranted by existing law or there is a good faith argument for the extension, modification or reversal of existing law and, (3) the Complaint is not made for any bad faith, vexatious, wanton, improper or oppressive reason, including to harass, to cause unnecessary delay, to impose a needless increase in the cost of litigation or to force an unjust settlement through the serious character of Defendants' detailed pattern of interrelated unlawful activities.

Dated this 12th of February, 2014.

/s/ Grant H. Goodman /s/ Teri Goodman

Grant H. Goodman, Teri Goodman
3104 E. Camelback Road, Suite 563
Phoenix AZ 85016
Phone: (602) 840-2393 (602) 999-9789
granthgoodman@msn.com

Copy of the foregoing E-filed or hand-filed this

12th of February, 2014:

Clerk of the Federal District Court—District of Columbia

Noticed to: U.S. Attorney/DOJ

# APPENDIX

## FEDERAL RICO REMEDIAL STATUTORY DEFINITIONS
### 18 U.S.C. § 1962 (Prohibited activities)

(A-1)   (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity … in which such person has participated as a principal within the meaning of section 2, title 18, United States Code [18 USCS § 2], to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(b) It shall be unlawful for any person through a pattern of racketeering activity … to maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C. §§ 1961 et seq.

(A-2)   (1) "racketeering activity" means (A) any act or threat involving ... bribery, extortion, ... , which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: ...  [18 USCS § 1341] (relating to mail fraud), [18 USCS § 1343] (relating to wire fraud), [18 USCS § 1503] (relating to obstruction of justice), ...  [18 USCS § 1512] (relating to tampering with a witness, victim, or an informant), [18 USCS § 1513] (relating to retaliating against a witness, victim, or an informant), [18 USCS § 1951] (relating to interference with commerce, robbery, or extortion), section 1952 [18 USCS § 1952] (relating to racketeering) ...;

(2) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, any political subdivision, or any department, agency, or instrumentality thereof;

(3) "Person" includes any individual or entity capable of holding a legal or beneficial interest in property;

(4) "Enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

(5) "Pattern of racketeering activity" requires at least two acts of racketeering activity ... and the last of which occurred within ten years after the commission of a prior act of racketeering activity;

§ 1951.   Interference with commerce by threats or violence

(A-3)   (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery **or extortion** or **attempts or conspires so to do,** or commits or threatens physical violence to any

person or property **in furtherance of a plan or purpose to do anything in violation of this section shall** be fined under this title or imprisoned not more than twenty years, or both. (b) As used in this section--(2) The term **"extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.** (3) **The term "commerce" means commerce within the District of Columbia,** or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

§ 1503.  Influencing or injuring officer or juror

(A-4)    (a) Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede ... any court of the United States, ... or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished as provided in subsection (b). Section    1512(c)(1)    criminalizes    "corruptly    alter[ing], destroy[ing], mutilat[ing], or conceal[ing] a record, document, or other object, or attempt[ing] to do so, with the intent to impair the object's integrity or availability for use in an official proceeding.

(A-5) The Sarbanes-Oxley Act, 18 U.S.C. § 1513(e) provides:  'Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for

providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense, shall be fined under this title or imprisoned not more than 10 years, or both. 18 U.S.C. § 1513(e). Section 1513(f) subjects wrongdoers to the same penalties for entering into a conspiracy to commit such acts. Under RICO, violations of § 1513 are considered "racketeering activity." 18 U.S.C. § 1961(1).

(A-6)   § 1512.  Tampering with a witness, victim, or an informant  (b) Whoever knowingly uses intimidation, threatens or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to--

(1) influence, delay or prevent the testimony of any person in an official proceeding; (2) cause or induce any person to--(A) withhold testimony, or withhold a record, document, or other object, from an official proceeding; (B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding; (C) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or (D) be absent from an official proceeding to which such person has been summoned by legal process; or (3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings; shall be fined under this title or imprisoned not more than 20 years, or both.

(c) Whoever corruptly--(1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or (2) otherwise obstructs,

influences, or impedes any official proceeding, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both.

(d) Whoever intentionally harasses another person and thereby hinders, delays, prevents, or dissuades any person from--(1) attending or testifying in an official proceeding; (2) reporting to a law enforcement officer or judge of the United States the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings; (3) arresting or seeking the arrest of another person in connection with a Federal offense; or (4) causing a criminal prosecution, or a parole or probation revocation proceeding, to be sought or instituted, or assisting in such prosecution or proceeding; or attempts to do so, shall be fined under this title or imprisoned not more than 3 years, or both.

(f) For the purposes of this section--(1) an official proceeding need not be pending or about to be instituted at the time of the offense; and (2) the testimony, or the record, document, or other object need not be admissible in evidence or free of a claim of privilege.

(g) In a prosecution for an offense under this section, no state of mind need be proved with respect to the circumstance--(1) that the official proceeding before a judge, court, magistrate, grand jury, or government agency is before a judge or court of the United States, a United States magistrate [United States magistrate judge], a bankruptcy judge[11], a Federal grand jury, or a Federal Government agency; or (2)

---

[11] Violation of **18 U.S.C. § 152** provides: A person who--(2) knowingly and fraudulently **makes a false oath or account in or in relation to any case under title 11**; (3) knowingly and fraudulently makes a **false declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28**, (4) knowingly and fraudulently **presents any false claim for proof** against the estate of a debtor, or **uses any such claim in any case under title 11**, *through an attorney*; (5) knowingly and fraudulently **receives any material amount of property** from a debtor after the filing of a case under title 11, with intent **to defeat the provisions of title 11**; (6) knowingly and fraudulently **gives, offers, receives, or attempts to obtain any**

that the judge is a judge of the United States or that the law enforcement officer is an officer or employee of the Federal Government or a person authorized to act for or on behalf of the Federal Government or serving the Federal Government as an adviser or consultant.

(h) There is extraterritorial Federal jurisdiction over an offense under this section.

(i) A prosecution under this section or section 1503 [18 USCS § 1503] may be brought in the district in which the official proceeding (whether or not pending or about to be instituted) was intended to be affected or in the district in which the conduct constituting the alleged offense occurred.

## § 1956. Laundering of monetary instruments

(A-7)   (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity--(A) (i) with the intent to promote the carrying on of specified unlawful activity; or (2) Whoever transports, transmits, or transfers, or attempts to

---

**money or property, remuneration, compensation**, reward, **advantage**, or promise thereof **for acting or forbearing to act** in any case under title 11; (8) after the filing of a case under title 11 or in contemplation thereof, knowingly and fraudulently **conceals, destroys, mutilates, falsifies, or makes a false entry in any recorded information** (including books, documents, records, and papers) **relating to the property or financial affairs** of a debtor; or (9) after the filing of a case under title 11, knowingly and **fraudulently withholds** from a custodian, trustee, marshal, or other **officer of the court or a United States Trustee** entitled to its possession, any recorded **information (including books, documents, records, and papers) relating to the property or financial affairs** of a debtor, shall be fined under this title, **imprisoned not more than 5 years**, or both.

transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States--(A) with the intent to promote the carrying on of specified unlawful activity of at least $10,000.

(2) Jurisdiction over foreign persons. For purposes of adjudicating an action filed or enforcing a penalty ordered under this section, the district courts shall have jurisdiction over any foreign person, including any financial institution authorized under the laws of a foreign country, against whom the action is brought, if service of process upon the foreign person is made under the Federal Rules of Civil Procedure or the laws of the country in which the foreign person is found, and—

(A) The foreign person commits an offense under subsection (a) involving a financial transaction that occurs in whole or in part in the United States;

(3) Court authority over assets. A court may issue a pretrial restraining order or take any other action necessary to ensure that any bank account or other property held by the defendant in the United States is available to satisfy a judgment under this section. (4) the term "financial transaction" means (A) a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments, or (iii) involving the transfer of title to any real property, vehicle, vessel, or aircraft, or (B) a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree; (5) the term "monetary instruments" means (i) coin or currency of the United States or of any other country, travelers' checks, personal checks, bank checks, and money orders, or (ii) investment securities or negotiable instruments, in bearer form or otherwise in such form that title thereto passes upon delivery; (iv) bribery of a public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official; section 666 [18 USCS § 666] (relating to theft or

bribery concerning programs receiving Federal funds), section 1030 [18 USCS § 1030] (relating to computer fraud and abuse).

(f) There is extraterritorial jurisdiction over the conduct prohibited by this section if -(1) the conduct is by a United States citizen or, in the case of a non-United States citizen, the conduct occurs in part in the United States; and (2) the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $ 10,000.

(A-8)    § 22-3251. Extortion (a) A person commits the offense of extortion if: (1) That person obtains or attempts to obtain the property of another with the other's consent which was induced by wrongful use of actual or threatened force or violence or by wrongful threat of economic injury; (2) That person obtains or attempts to obtain property of another with the other's consent which was obtained under color or pretense of official right.

TRIAL/HEARING TESTIMONY—The Vulnerable Adult Cases
FEBRUARY 27, 2012

(A-9)    Stacey Johnson (Mallet Appointed Counsel Proffered by State Bar)
"Q. [Miller]. This [complaint] was signed by Ms. Mallet on January 26th, 2010. What was your role at that point in the Mallet matter? A. In the probate matter I was her court-appointed counsel consistently from 2009 through 2011. Q. And at this point do you recall if she was still under a guardianship or conservatorship? A. I don't recall the status of the guardianship on this particular date. The guardianship ... but the guardianship was temporary ... And then ... it actually terminated...I believe it was before this date ... [TR: page 16, lines 1-23].

Q [Goodman]. And if I'm not mistaken, you were looking to obtain Helga's (Mallet) written consent in terms of a contractual waiver of liability against Sun Valley Group and their attorneys; true? ... A. I was requesting her input and authorization to settle... Q. Okay. Meaning you wouldn't enter into any contractual relationship without her authority; true? ... Q. ... She was competent enough to communicate with you her desires and her objectives in terms of settling, if she was going to settle at all; true?...A. She had sufficient – she's high enough functioning for me to review her options with her. [TR: 42-43].

Q [Goodman]. But in fact, Mr. Elwell wanted to impress upon Ms. Mallet fees incurred arising out of this civil lawsuit, Exhibit 17, to take those monies out of the Mallet estate in exchange for a release; correct? ... Q. Right. And if she didn't agree to release and waive her rights to pursue those attorneys, they would go after her for their attorney fees incurred in defending this civil suit; true? A. That's my understanding, yes. [TR: page 45].

Q [Goodman]. Was Helga ever instructed that she should sign that waiver of liability against Sun Valley, Southwest and their attorneys, so that she could 'get her life back', or at least maybe that's how it was phrased to you by Mr. Elwell and company? .... Q. They wanted to trade or release the conservatorship in exchange for the release of the liability; true? A. Yes. MR. GOODMAN: I have nothing further. [TR: page 47, lines 1-10].

Greg DoVico; February 6, 2012 (Self-Appointed Fiduciary)

(A-10)     THE WITNESS: No, Ms. Mallet did not hire us. We were appointed by the court, so we reported to the court not Mrs. Mallet. She had no capacity to make those financial decisions. (TR: page 209, lines 7-10). Q. BY MR. GOODMAN: Okay. Were you employed as a fiduciary with your duties running to Ms. Mallet? A. Yes. Q. And as a fiduciary, what did those duties include? A. Protect her assets. (Page 210, lines 8-13). Q. And did you feel that you were privileged to take or expend assets, resources, call it what you will of the estate without notifying Ms. Mallet? A. Yes. (TR: page 212, lines 2-5). Q. And you don't know whether Helga was capable of taking care of herself and her medical needs, or whether she was even living on her own 500 miles away from this jurisdiction; is that true? A. I have no idea. (Page 218, 17-21).

Q. [Goodman] So Ms. Mallet goes into the probate system with approximately $1.8 or so million in assets. Do you know what she left with? A. [Dovico] No, sir. We were dismissed and exonerated from the case. I did not follow it after that...Q. -- was there any notice or some notice given nine days in advance of the hearing date? A. No, sir. Q. Was there any notice at all? A. No, sir. (TR: page 240, lines 6-12). A. ...   It is customary; it's a standard industry practice of paying attorneys, fiduciaries and other (TR: page 253, 19-25).

A. As I testified before, the court allows distributions made, and the reason is very practical. If we could not make distributions or payments for our fees or attorneys' fees, in my case I would probably need to get a line of credit from the bank of about $2 million, and I don't think I could.

Q. I'm sorry, I misunderstood. Sir, are you suggesting that you didn't actually take the money? I mean what you're saying, if I understand you correctly, and you correct me if I'm wrong, you would take a cash payment or a distribution. At some point within a year thereafter, you would notify and request of the court approval of the funds that you received potentially one year prior; is that fair? A. Yes. (256-257).

FEBRUARY 7, 2012 [DoVico (continued), Proffered by State Bar]

(A-11)    Q. I'm sorry, I'm talking about in terms of redress, and assuming that for the moment that her belief that funds were being wasted of the estate for the benefit of those charged to protect her interests. In that circumstance, she would have the right to retain her own counsel. A. Not if she was under the Court's jurisdiction as a protected person, she would not. Q. And that's your understanding of the law; correct? A. My understanding of the practical application. (TR: page 61, lines 8-18). Q. And the practical application means that you, as the assigned fiduciary in this case, had the ability to limit or curtail Ms. Mallet's right to redress for her perceived constitutional violations; correct? A. I believe so. (TR: page 61, lines 21-25).

Q. Did you personally involve yourself in the Mallet file? A. No, sir, I have already testified to that. Q. Have you signed affidavits avowing to personal (Page 22, lines 17-25) knowledge? A. Yes. Q. Under penalty of perjury? A. Yes. (TR: page 23, lines 1-4). A. Yes and records that they created, whether verbal or written. Q. You consider a verbal comment to be a record? A. Yes. (TR: page 47, lines 3-6).... Q. The temporary conservatorship was commenced on or about February 22nd, 2008 by your offices; correct? A. Yes. Q. And who was the signatory as the petitioning party? A. Mine. Q. And in terms of a contemporary conservatorship, was there any

1  adjudication as to mental competency in an emergency setting? A. No. (TR: page

2  69).

3

4  Q. BY MR. GOODMAN: Do you recall reviewing any documents with signed

5  authorization from Ms. Mallet that she was waiving any of her Civil Rights? A. No,

6  as a protected person, she was under the control of the probate court. Q. And your

7  understanding is that the probate court, a judge, a lawyer, is it your understanding

8  that they have the ability to waive Ms. Mallet's constitutional rights or due process

9  rights? A. I don't believe they do... (TR: page 58, lines 2-12)...Q. And it is your

10  advice or -- are you possessed of any knowledge that Ms. Mallet was given the

11  opportunity to even retain her own counsel or advised of her ability to do so? A. I

12  do not know. (TR: page 58, lines 15-19).

13

14  Q. Was there a bank or a chartered financial institution involved in this case in terms

15  of the margin account? A. Not a bank. AG Edwards is the brokerage account. I don't

16  believe they are a chartered financial institution in Arizona. They are a national

17  organization, and they are a stock brokerage house. Q. I'm sorry; I meant to say a

18  federally chartered financial institution. That's true; correct? (TR: 28, lines 10-18).

19  TYLER SWENSEN (Ravenscroft Attorney-Non-Probate/Proffered by State Bar)

20

21  (A-12)    Q. And did you ever at any time acquire information in a thumb drive that

22  you took with you when you exited the offices? MS. MILLER: I'm going to object

23  to relevancy....Q. And I'm looking for the fact that when you left, is it not true that

24  you had taken a thumb drive of proprietary information from the computer?....MS.

25  MILLER: May I direct you, though, to my arguments that I put in my motion in

26  limine regarding this very issue...MR. GOODMAN: I'm not looking to impeach,

what I'm looking for is he had full access to a – an electronic copy of all the documents on this and other files, and that he would have access to an important e-mail like this if he knew that he was going to testify to this fact. All I want to do is see a copy of that e-mail.

Q. Did you take a thumb drive or some other electronic retrieval system that had proprietary documents from the firm that you took home? A. Well, it's a compound question. Are you saying that I took a thumb drive from your office that belonged to you? Q. ... Did you have your wife bring a thumb drive of information back to our offices? A. Yes, I did.... Q. That -- there isn't a doubt in your mind that that was owned by the firm; correct? A. It was your property, yeah. It was the firm's property.... (TR: pages 158-163). ...

MALLET HEARING: JUDGE MROZ; February 16, 2011

(A-13)    THE COURT: -- here's the situation: there's no need for a conservatorship if there's no assets to conserve, right? (TR: page 14, lines 12-15).... MR. ELWELL: ...Because if this Court, this is Jerome on the world, okay? If this Court terminates Ms. Mallet's conservatorship then she will, that day, enter into a fee agreement with Mr. Goodman (TR: page 15, lines 1-5)....THE COURT: Let me go back. She can sue anybody that she wants to sue, she's never been judged incapacitated, right? -- THE COURT: Early on, but it was resolved. MS. JOHNSON: A long time, yes. (TR: page 16, lines 1-10)....THE COURT: And it's obvious to me that Sun Valley Group cannot remain to finish out the litigation of the petition to terminate. (TR: page 17, lines 3-7)

MS. MALLET: Sun Valley now is talking about I cannot get out of conservatorship, but they will help me, that the State would pay for me. I don't want to become a State case. I'm still able to work. I could even keep two jobs. I am very, very healthy and very strong, but these people are trying to intimidate me to a point where I cannot take this anymore, Your Honor. (TR: page 24, lines 5-11).

MS. MALLET: -- did I have to listen to, "You don't understand, you have no rights." (TR: page 24, lines 24-25). MS. MALLET: I have been an American citizen for 40 years and we do have rights. (TR: page 25, lines 2-3). MR. ELWELL: -- we didn't have valuations done. (TR: page 26, line 19).... MS. MALLET: At this point may I talk, Your Honor? THE COURT: Sure. MS. MALLET: Are you aware that Sun Valley wanted me to sign a contract, although they say I'm not competent to sign anything when it comes to Mr. Goodman. But they wanted me to sign, and they wanted up to 200,000 and I would be free the next day. – (TR: page 33, lines 21-25).

MR. ELWELL: ...She has significant properties, real properties, the one she's living in, which is debt-free. If the conservatorship is terminated Ms. Mallet could, if she wanted to, assign that real property to someone like, oh, let's make a name up, Grant Goodman, in exchange for his attorney's fees and costs in bringing ... litigation on her behalf, which would subject her assets to further risk; that's one scenario. (TR: page 28, lines 15-25; page 29, lines 1-8).

MS. MALLET: You see, the point is that I have never been protected. My money has been squandered. There was no reason for me to lose my houses. I was in real estate; I had plenty of backups in gold coins, in diamonds, which everything disappeared out of my houses. They had the only key, and they could go in them,

and they ransacked many, many times to find all the valuables. I have letters that show that. THE COURT: All right. MS. MALLET: Like I said in the very beginning, they have stripped me naked these people, (i.e., Elwell and SVG) and they know that I still (TR: page 35, lines 15-25) have a few pieces of land and they want that too. (TR: page 36, lines 1-5).

MR. ELWELL: Yeah. And I would appreciate this Court directing the Sun Valley Group to defund the trust. (TR: page 36, lines 24-25). ELWELL con't: …placing the assets into the conservatorship estate. MR. ELWELL: We could provide you with a final accounting and request for discharge together with any fee applications and Rule 33 statements (more fiduciary and attorney fees) within 90 days of today's date. (TR: page 39, lines 5-11). THE COURT: All right. Thank you. Bye-bye. (Proceedings concluded at 10:18 a.m.) (TR: page 45, lines 4-5).